Samantha Carter
PRO PER
1001 S. Main St. Suite 5524
Kalispell, MT 59901

caseink@protonmail.com

**PRO PER:** Plaintiff Samantha Carter

> LODGED
> CLERK, U.S. DISTRICT COURT
>
> **8/10/20**
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: ___CS___ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

CV20-7154

| | |
|---|---|
| SAMANTHA CARTER, an individual) | CASE NO.: |
| Plaintiff, | ) COMPLAINT FOR DAMAGES |
| v. | ) |
| VINCENT MEHDIZADEH aka VINCENT ZADEH, an individual; SHAWN CREDLE, an individual; JAIME ORTEGA, an individual; PINEAPPLE VENTURES, INC., a California corporation; and NEU-VENTURES, INC., a California corporation; | ) • **FRAUDLENT CONVEYANCE** ) • **MINORITY SHAREHOLDER** ) **FRAUD** ) • **BREACH OF CONTRACT** ) • **UNJUST ENRICHMENT** ) • **REQUEST FOR** ) **INVOLUNTARY** ) **DISSOLUTION Under Cal** |
| Defendant(s). | ) **Corp Code § 1800(b)(3) and Cal** ) **Corp Code § 1800(b)(5)6510** |

The Plaintiff alleges as follows:

### PARTIES

1.    The Plaintiff,   SAMANTHA CARTER (hereafter referred to as "CARTER ") is a citizen of the District of Columbia.

-1-

**COMPLAINT FOR DAMAGES**

2.      Defendant VINCENT MEHDIZADEH aka VINCENT ZADEH (hereafter referred to as "Zadeh") is an individual who at all relevant times resided and did business in the City of Los Angeles, State of California.

3.      Defendant JAIME ORTEGA (hereafter referred to as "Ortega") is an individual who at all relevant times resided and did business in the City of Los Angeles, State of California.

4.      Defendant PINEAPPLE VENTURES, INC. (hereafter referred to as "PV") is a California corporation with its principal place of business in the City of Los Angeles, State of California.

5.      Defendant NEU-VENTIRES, INC. (hereafter referred to as "NV") is a California corporation with its principal place of business in the City of Los Angeles, State of California.

6.      Zadeh, Ortega, PV and NV hereafter will be referred to as   the "Defendants" when discussed collectively.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this Complaint under 28 U.S.C. § 1332 (a)(1), diversity of citizenship. Carter is a citizen of the District of Columbia; Defendants Zadeh, Ortega, are residents of California, and PV and NV are California corporations that are headquartered in California. Carter has suffered damages in excess of $75,000 due to fraud perpetrated by the Defendants.

8.      This Court has personal jurisdiction over the Defendants because the Defendants operate and maintain their corporate headquarters within this jurisdiction, located at 10351 Santa Monica Blvd Suite 420, Los Angeles, CA 90025

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the Defendants live and maintain and operate their corporate headquarters within this jurisdiction.

-2-

**COMPLAINT FOR DAMAGES**

## GENERAL ALLEGATIONS

10. PV operates a cannabis delivery service in Los Angeles, California.

11. Zadeh is the co-founder of PV.

12. Zadeh is the Chief Executive Officer of NV.

13. Ortega is the Chief Financial Officer and sole Director of PV.

14. Ortega is the Secretary and sole Director of NV.

15. Carter entered into Purchase/Shareholder business contractswith September of 2019, which were negotiated by Zadeh and signed by Ortega on behalf of PV.

16. On or about September 19, 2019, Zadeh called and texted Carter on the phone to request that she invest money in PV immediately to receive dividends monthly beginning November 2019.

17. Zadeh represented to Carter that PV was in the process of closing another deal with another investor whom was about to purchase the last amount of shares.

18. According to Zadeh, he had already put $5,000,000.00 of his own money into PV and Pineapple Express, and was in the process of adding additional concepts to Pineapple Ventures with CEO Shawn Credle, and that Carter would receive net revenue from all of the companies at 4/10 of 1% (.40%) monthly.

19. Carter told Zadeh that she was interested in investing more money later but would began with $80,000.00 to close the deal to purchase the last 400 of the few shares remaining.

20. Zadeh assured Carter that she would receive her first check of 8-10K monthly beginning in November 2019.

21. Zadeh asked Carter to wire the funds to the bank account but Carter preferred to do a Check from her account through Bill Pay.

22. The terms of the agreement for Carter to provide $80,000.00 to defendants was memorialized in an email, by text and in a document that was incomplete. Zadeh sent to Carter on September 17, 2019. A copy of this email is attached hereto as Exhibit 1.

23.    On August 27, 2019 Plaintiff initiated contact through a website for Investors named BuyBizSell.com and read Defendants pitch to own a portion of a company with an investment.

24.    On September 10, 2019, Carter  was informed that Shawn Credle was the CEO  to  Pineapple Ventures, Inc. and Zadeh provided her with what appeared  to  be  well  rounded  information.  Zadeh even invited Plaintiff to Century City to meet and informed Carter that even State Representatives and Senators have invested with the company and he would provided references for her to call, ecstatically.

25.    On September 10, 2019, Carter received suggestions from Zadeh that almost everyone contracts as an LLC and that he would set up Carter's LLC. Carter decided to set up her own LLC and sent a check for $80,000.00 around September 25, 2019.

26.    On October 1, 2019, Zadeh cashed  her  personal  check  finally provided an explanation of why Walling was not being paid.  By that time, it was clear that Defendants never intended to repay Walling within ten days, or at all.

27.    On October 5, 2019, Zadeh sent Carter an email in fury and informed her that her check bounced and that she is to wire $80,000.00 into the company account immediately. Carter had sent certified funds. A copy of this email is attached hereto as Exhibit 2. The check was cashed in Bank of America and had cleared.

28.    In Zadeh's email  h e  s h a m e d  Carter and attempted to bully her into sending another 80k informing her that, "This is not a drill," and that he was very serious that s h e  h a d  t o  m a k e  i t  r i g h t.

29.    Defendants stated they were absolutely furious with Carter. However, the funds were gone from her account and the defendants claimed not  to have them. Carter informed Zadeh on October 7, 2020 that once she gets her money back she is going to keep it and that everything is canceled.

30.    Zadeh informed Carter a few days later that he had Carter's money and the check did clear but Carter was not engaging in any business with PV or NV.

31.   In addition to the principal that Defendants have improperly retained from Carter, Carter never received a dividend of any kind to-date and has lost significant income that she could be earning from her funds if she had invested them in another venture.

## FIRST CAUSE OF ACTION

### (Fraud Against All Defendants)

32.   Carter re-alleges and incorporates herein by reference all the previous allegations to this complaint as though fully set forth at this point.

33.   Defendants intended to induce Carter to wire them another $80,000.00.

34.   Carter witnessed the defendants taking trips on social media.

35.   Zadeh acting on behalf of himself and other defendants misrepresented to Carter that he invested $5,000,000.00 of his own money and the company had political figures as investors.

36.   Zadeh's representations were material because if Zadeh had not told Carter that he was invested his own funds and showed Carter that the company was growing successfully and was strong financially Carter would not have sent the $80,000.00 **but Carter was definantely not going to wire another $80,000.00.**

37.   If Defendants had represented to Carter that they needed the funds for marketing and to have promo parties and take trips Carter would not have invested money knowing they were going to live off of it.

38.   Defendants never intended to distribute dividends, monthly. This is proven by the fact that as soon as the the check was cashed, Zadeh began shaming Carter and attacking the character of the Investor when she simply wanted clarity. When Zadeh finally displayed that this was a scam, Carter was devastated.

39.   Carter reasonably relied on Defendants' misrepresentation because he the dual CEO had mentioned he had seven college degree's appeared to be austere.

40.   As a direct and proximate result of Defendants' breach, Carter  has suffered damages that exceed $75,000.00.

1   41.   Defendants have actions as alleged herein were malicious, oppressive
2   and taken in reckless disregard of Carter rights, so as to justify an award of
3   punitive damages sufficient to punish and deter Defendants from engaging in such
4   conduct in the future.
5
6   ## SECOND CAUSE OF ACTION
7   ### (Breach of Contract Against All Defendants)
8   42.   Carter re-alleges and incorporates herein by reference all the previous
9   allegations to this complaint as though fully set forth at this point.
10   43.   Carter and Defendants entered into valid and binding contract,
11   requiring Defendants to repay the investment through dividends monthly from 8-10k.
12   44.   Carter has fully performed under her contract with the Defendants.
13   45.   Defendants have breached the contract with Carter by failing to pay
14         dividends.
15   46.   As a direct and proximate result of Defendants' breach, Carter has
16   suffered damages that exceed $75,000.00.
17   47.   As of the date of this complaint, Defendants owe Walling $88,000.00
18   in unpaid principal.
19
20   ## THIRD CAUSE OF ACTION
21   ### (Unjust Enrichment Against All Defendants)
22   48.   Carter re-alleges and incorporates herein by reference all the previous
23   allegations to this complaint as though fully set forth at this point.
24   49.   Carter conferred a benefit upon Defendants when she sent them
25   $80,000.00 to be repaid in full within one year through monthly dividends.
26   50.   Defendants have stated that they tried to send Plaintiff's money back but
27   did not have an address for her. Defendants then threatened to sue Plaintiff.
28   51.   As between Carter and Defendants, it would be unjust for Defendants

-6-
**COMPLAINT FOR DAMAGES**

1   to retain the benefit and keep her money because they were able to get her to send it.

2

3   ## FOURTH CAUSE OF ACTION

4   ### (Imposition of a Constructive Trust Against all Defendants)

5   52.   Carter re-alleges and incorporates herein by reference all the previous

6   allegations to this complaint as though fully set forth at this point.

7   53.   The legal remedy of damages will not adequately compensate Carter for

8   the loss of the funds she thought she was investing with Defendants.

9   54.   Carter has been irreparably harmed by Defendants' continued use of

10  these funds and failure to satisfy their obligations, and Defendant will be unjustly

11  enriched.

12  55.   Carter is informed and believes that the funds she invested to

13  Defendants can be traced to assets acquired by Defendants with funds as well as the

14  bank account the check was cashed in and that some or all of these assets are

15  presently owned by Defendants as they attempted to move them to elsewhere.

16  Therefore, the imposition of a constructive trust on the assets of Defendants is

17  necessary to prevent irreparable harm to Carter and unjust enrichment to Defendants.

18

19  ## FIFTH CAUSE OF ACTION

20  ### (Unfair Business Practices in Violation of California Businesses and Professions

21  ### Code §17200, *et seq.* Against All Defendants)

22  56.   Carter re-alleges and incorporates herein by reference all the previous

23  allegations to this complaint as though fully set forth at this point.

24  57.   Defendants have engaged in acts of unfair competition through unlawful,

25  unfair, and/or fraudulent business acts or practice as defined in California Business

26  & Professions Code section 17200, *et seq.*, by engaging in the unlawful acts

27  and practices alleged herein.

28  58.   The unlawful, unfair and/or fraudulent practices alleged herein are based upon

    Defendants misrepresentation of facts in order to obtain investor funds that

1  they do not repay.  This has given Defendants an unfair business advantage against

2  competitors who do not engage in the same practices.

3      59.  As a direct and proximate result of these unlawful and unfair practices,

4  Carter has lost income she would otherwise have earned by investing her funds in

5  other ventures, but for the aforesaid unfair business practice, which has unjustly

6  enriched Defendants. Defendants should be made to disgorge and make restitution of

7  and restore all ill-gotten gains attributable to these acts and practices to Carter.

8      60.  Under the Business & Professions Code section 17203, Carter is

9  entitled to obtain restitution of these funds for Defendants' unfair business practices

10  as enumerated herein.

11      61.  Pursuant to Business & Professions Code section 17203, injunctive relief

12  is necessary to prevent Defendants from continuing to engage in the unfair business

13  practices as alleged herein. Carter is informed and believes that Defendants, and

14  persons acting in concert with them, have committed and will continue to commit the

15  above unlawful acts unless restrained or enjoined by this Court. Unless the relief

16  prayed for below is granted, a multiplicity of actions will result.

17

18  ## PRAYER FOR RELIEF

19      **WHERFORE**, Carter prays for relief against the Defendants as follows:

20      1.  For compensatory damages exceeding $75,000 according to proof;

21      2.  For punitive damages according to proof;

22      3.  For imposition of a constructive trust;

23      4.  For an order that Defendants disgorge and make restitution of all

24          ill-gotten gains attributable to the acts and practice alleged herein;

25      5.  For pre-judgment interest;

26      6.  For post-judgment interest;

27      7.  For travel fees, if needed;

28      8.  For costs of suit; and

-8-

**COMPLAINT FOR DAMAGES**

1    9.    For such other and further relief as the Court deems proper.

2

3    Dated: August 7, 2020        RESPECTFULLY SUBMITTED,

4

5                                By: _____

6                                     SAMANTHA CARTER
                                      Plaintiff Pro Per
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-9-

**COMPLAINT FOR DAMAGES**

# Re: Your BizBuySell listing Own a % of our LA Cannabis Dispensary

## Received: ↱ Saturday, August 31, 2019 7:42 PM

## From: Pineapple Ventures Inc. info@pineappleventuresinc.com

PLAINTIFF'S EXHIBIT
No. __1__
Date: 8/7/2020

## To: vpoffice@protonmail.com

Thank you for your recent inquiry through BizBuySell.com regarding our canna-business opportunities in SoCal. We are successful operators in the legal cannabis industry and have been for over a decade.

Please find                                      giving you more information on us, as well as a link to our NDA for your review, execution, and return by                                        . We look forward to speaking with you after we receive the executed NDA. Thereafter, we can schedule a phone call or in-person meeting at your convenience.

We recently hosted a free webinar on a wide array of cannabis investment opportunities,                                            . Feel review the material and feel free to circle back if interested in learning more about our investment opportunities.

We are in the process of establishing additional storefront retail dispensaries in prominent areas of Los Angeles. We are selling equity in those dispensaries to qualified investors. All of our investments offer anti-dilution, put-option in the event investors choose to be cashed out after a year, and guaranteed monthly dividends. Based on our experience and historical data we project these dispensaries to earn a perpetual ROI for investors of between 80-125% year after year.

We have a long list of happy investor partners and we look forward to adding new ones as we expand our footprint in California.

Warm Regards,


Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.




## On Tue, Aug 27, 2019 at 1:58 AM <interest@bizbuysell.com> wrote:

Find and Request Information from the franchis

## Notification: New buyer lead from BizBuySell


Dear Pineapple Ventures,


You've received a message regarding your listing on BizBuySell.


**Bu er Information**

**Contact Name:**    Samantha Carter

**Contact Email:**   vpoffice@protonmail.com

Pineapple Ventures I vpoffice@protonmail.com I ProtonMail

**Contact Phone:**  (646) 757-0277

**Comments:**

So 100k and the ROI is 5 percent annually? Is that correct? Thanks.

**Listing Information**

**Headline:**  Own a % of our LA Cannabis Dispensary

**Listing ID:**  1656196

You can reply directly to this email to respond to the buyer. For your convenience, we have also saved 's profile in your My BizBuySell account.

If you believe this business for sale message is not a legitimate inquiry, please report it as spam.

Thank you,
BizBuySell

This system email was sent to info@pineappleventuresinc.com by BizBuySell. Per BizBuySell's membership Terms of Use, as a member of BizBuySell you will continue to receive all system messages and product announcements.

© 2018 BizBuySell - All rights reserved. 101 California St. 43rd Floor, San Francisco, CA 94111

Pineapple Ventures I vpoffice@protonmail.com I ProtonMail

PLAINTIFF'S EXHIBIT
No.   2
Date: 8/7/2020
CREDLE IS CEO

# Re: BizBuySell.com Business Opportunity Inquiry

**Received:**   ↪ **Tuesday, September 10, 2019 2:55 PM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**

To: **vpoffice@protonmail.com**

CC: **Shawn Credle shawn@pineappleventuresinc.com, Jaime Ortega jaime@pineappleventuresinc.com**

Hi Samantha:

I would love to walk you through our processes and discuss who we are and what we do more specifically on the phone as well. Let me know your availability for a chat tomorrow or the following day. In the meantime, thank you for your continued interest in us. Our Creative Director, Jen, repurposed and cut a video on us. Please follow the link here for that video. The video gives you a glimpse into who we are and It features our CEO, Shawn Credle, as well as the imagery that is Pineapple Express, THC Premium Brand, and Pineapple Wellness (our Hemp CBD product line). In the video Shawn references Pineapple Express, Inc. which is a public company. We bought into that public company as an investment.  Shawn serves as dual CEO to the public company and also the private company, Pineapple Ventures, Inc. which has the potential investment offerings. Any investment by you and equity stake would have nothing to do with the public company, just to clarify.

We always ask people to sign a confidential qualification and non-disclosure agreement before entertaining any potential investments. We don't show one in our records for you but we can save that for later once you confirm your further interest. A sample of the same is attached hereto for your review.

Attached please find our corporate presentation. which I have sent you in prior emails. I'm reattaching the presentation along with other documents so you have everything in one email. Also attached are our projections for the next couple years which demonstrate the likelihood that you will make monthly dividends equaling 100% ROI the first 2 years and 75% thereafter, year after year. We sold 10% of PVI last quarter at a valuation of $30m We are selling a total of 20% total with this middle 10% round at $40m valuation.

The attached Organizational Chart documents our current equity stake portfolio and can be attached as an exhibit to any equity sales contract we sign with you. Also, here are all our various issued permits for your records.

I'm also attaching our testimonials. We can arrange a talk with a few of these prior partners, at your convenience. They will attest to our professionalism, performance, and accessibility over the years we have worked with them and made them millions.

Lastly, from December 11-13th we are going to be exhibiting in Las Vegas at the largest cannabis business conference in the world, MJBizCon. Regardless of whether you decide to allow us the opportunity to become your investment partner, feel free to stop by and visit us at the show. We like making new friends. :-)

All of our equity comes with mandatory monthly dividends, anti-dilution option, and put option after the first year if you are unhappy with the investment for any reason. For your reference, please find a redacted copy of what one of our other investors signed to give you an idea of what your agreement would look like. We have deals available from $100k for 2.5% of a single dispensary, all the way to 1% of all of our various operations (PVI) for $400k. PVI is the real jewel of all our offerings since that will continue to expand as we gobble up other assets. Depending on your level of investment we could also accommodate 3% of PVI for $1m. Let us know if we can offer anything further. Should you wish to proceed with a transaction, let us know and we can forward you a draft shareholder agreement and share purchase agreement.

Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

On Tue, Sep 10, 2019 at 11:13 AM <vpoffice@protonmail.com> wrote:
Vincent,

Good Afternoon. I believe, I am interested. Is there a contract that I can pre-read before hand. Also, may I buy shares as a company vs. a person?

S. K. Carter

PLAINTIFF'S  EXHIBIT
No.__3__
Date: 8/7/2020

Sent with ProtonMail Secure Email.

------- Original Message -------
On Monday, September 9, 2019 9:06 PM, Vincent Zadeh <vincent@pineappleventuresinc.com> wrote:

Dear Prospective Cannabis Entrepreneurs:

Thank again for your recent inquiry through BizBuySell.com regarding our canna-business opportunities in SoCal.

We are successful cannabis operators with a proven track-record of over 125 successful dispensaries and cannabis production facilities established across 8 states. Part of our process is we sell minority equity to qualified investors in each of our projects (typically up to 25%) to help us build that project and expand to the next one.

Our current focus is our home State of California. The following are a few opportunities that are currently available to accredited investors. All of these opportunities we own and operate ourselves. Some of these opportunities may be of further interest assuming you qualify to invest.

### Deal 1: Own 2.5% - 10% of our Licensed Dispensary at Hollywood and Vine for $100,000 per 2.5% up to 10% for $400,000.

We own a licensed dispensary at Hollywood & Vine in Hollywood. This location is one of the most travelled intersections in the world. We relocated the license from another location within the City and have our approvals to operate. The project is currently in construction plan submittal phase with the City of Los Angeles and our tentative operations start date is November 1st.

Dispensary licenses alone are valued at $3m and based on the amazing location, we feel that the dispensary with leased location is easily worth $4m. We have up to 10% available for sale of this opportunity in increments of $100,000 per 2.5%. We offer all investors anti-dilution rights, guaranteed monthly dividends,  and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 75-100% each year, perpetually.

### Deal 2: Own 2.5% - 10% of our Licensed Dispensary at in North Hollywood for $50,000 per 2.5% up to 10% for $200,000.

We own a licensed dispensary in North Hollywood. This location is not as sought after as the Hollywood and vine · location so the valuation is half as a result. We relocated the license from another location within the City and have our approvals to operate. The project is currently in construction plan submittal phase with the City of Los Angeles and our tentative operations start date is November 1st.

Dispensary licenses alone are valued at $3m, but we feel that the dispensary with leased location is worth $2m on a very deep discounted valuation. We have up to 10% available for sale of this opportunity in increments of $50,000 per 2.5%. We offer all investors anti-dilution rights, guaranteed monthly dividends,  and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 50-75% each year, perpetually.

### DEAL 3: Own a Percentage Of Our Entire Pineapple Ventures, Inc. (PVI) Cannabis Conglomerate

 Pineapple Ventures has equity in over 18 canna-business licenses in CA and 2 dispensaries in Puerto Rico that are owned and operated by the company, a hemp wellness product site, and cannabis subleases that it draws a rental profit from. Pineapple Ventures is expanding at a substantial rate and will be acquiring more businesses in 2019 and onward. Specifically, PVI owns and operates:

- ·   100% of a state licensed cultivation, manufacturing, and distribution licensee in Adelanto, CA,

- ·   30% of a state licensed retail dispensary and delivery service in Los Angeles, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

- ·   30% of a state licensed retail dispensary and delivery service in Palm Springs, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

- ·   30% equity stake of 2 separate state licensed manufacturing entities,

- ·   30% of 1 state licensed cultivation entity and 15% of 1 distribution entity,

- ·   15% of 3 separate state licensed cultivation and manufacturing entities,

- ·   50% of 2 Los Angeles dispensaries (NoHo and Hollywood & Vine),

- ·   100% of Pineapple Express Wellness, Inc., an operating a nationwide Hemp CBD website at PineappleExpressWellness.com,

# Re: Confirmation

Received: ☐ **Thursday, September 19, 2019 7:58 PM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**

PLAINTIFF'S EXHIBIT
No. 5
Date: 8/7/2020

To: **vpoffice@protonmail.com**

CC: **Vincent Zadeh vincent@pineappleventuresinc.com**

Why? Do you feel like speaking to the many people we've partnered with and successfully made money for? Happy to set up a peace of mind conference call at your convenience.

I've personally spent $5 million of my own dollars and the company spent $15 million on the infrastructure we currently have that is worth at least $30 million. You're investing in something big and in an industry that is huge!

Congrats,

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.
*(Apologies for any dictation related typos)*

On Sep 19, 2019, at 5:49 PM, vpoffice@protonmail.com wrote:

Vincent,

I don't know how I feel about this now...Oh my...Attached is confirmation.

Samantha

Sent with ProtonMail Secure Email.

<Screen Shot 2019-09-19 at 8.46.42 PM.png>

·   100% of Nordhoff Leases, LLC, an entity entitled to a profit for subleasing 38,000 SF of rental space to commercial cannabis licensed growers at a building In Chatsworth, CA.

·   50% equity interest in 2 Puerto Rico retail store front Dispensaries

We have up to 17% available for sale of this opportunity in increments of $200,000 per .5% or $400,000 per 1%. We offer all investors anti-dilution rights, guaranteed monthly dividends, and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 50-100% in the first year and 150-200% ROI each year thereafter, perpetually. This entity is constantly expanding and picking up assets as we go so the growth potential is enormous.

Interested parties are instructed to reply back for further information.

Warm Regards,

Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.



# BizBuySell.com Business Opportunity Inquiry

Received: ↩ **Monday, September 9, 2019 8:06 PM**

**PLAINTIFF'S EXHIBIT**
No. __6__
Date: 8/7/2020

From: **Vincent Zadeh vincent@pineappleventuresinc.com**

To: **Pineapple Ventures Inc. info@pineappleventuresinc.com**

Dear Prospective Cannabis Entrepreneurs:

Thank again for your recent inquiry through BizBuySell.com regarding our canna-business opportunities in SoCal.

We are successful cannabis operators with a proven track-record of over 125 successful dispensaries and cannabis production facilities established across 8 states. Part of our process is we sell minority equity to qualified investors in each of our projects (typically up to 25%) to help us build that project and expand to the next one.

Our current focus is our home State of California. The following are a few opportunities that are currently available to accredited investors. All of these opportunities we own and operate ourselves. Some of these opportunities may be of further interest assuming you qualify to invest.

### Deal 1: Own 2.5% - 10% of our Licensed Dispensary at Hollywood and Vine for $100,000 per 2.5% up to 10% for $400,000.

We own a licensed dispensary at Hollywood & Vine in Hollywood. This location is one of the most travelled intersections in the world. We relocated the license from another location within the City and have our approvals to operate. The project is currently in construction plan submittal phase with the City of Los Angeles and our tentative operations start date is November 1st.

Dispensary licenses alone are valued at $3m and based on the amazing location, we feel that the dispensary with leased location is easily worth $4m. We have up to 10% available for sale of this opportunity in increments of $100,000 per 2.5%. We offer all investors anti-dilution rights, guaranteed monthly dividends,  and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 75-100% each year, perpetually.

### Deal 2: Own 2.5% - 10% of our Licensed Dispensary at in North Hollywood for $50,000 per 2.5% up to 10% for $200,000.

We own a licensed dispensary in North Hollywood. This location is not as sought after as the Hollywood and vine location so the valuation is half as a result. We relocated the license from another location within the City and have our approvals to operate. The project is currently in construction plan submittal phase with the City of Los Angeles and our tentative operations start date is November 1st.

Dispensary licenses alone are valued at $3m, but we feel that the dispensary with leased location is worth $2m on a very deep discounted valuation. We have up to 10% available for sale of this opportunity in increments of $50,000 per 2.5%. We offer all investors anti-dilution rights, guaranteed monthly dividends, and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 50-75% each year, perpetually.

### DEAL 3: Own a Percentage Of Our Entire Pineapple Ventures, Inc. (PVI) Cannabis Conglomerate

Pineapple Ventures has equity in over 18 canna-business licenses in CA and 2 dispensaries in Puerto Rico that are owned and operated by the company, a hemp wellness product site, and cannabis subleases that it draws a rental profit from. Pineapple Ventures is expanding at a substantial rate and will be acquiring more businesses in 2019 and onward. Specifically, PVI owns and operates:

· 100% of a state licensed cultivation, manufacturing, and distribution licensee in Adelanto, CA,

· 30% of a state licensed retail dispensary and delivery service in Los Angeles, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

· 30% of a state licensed retail dispensary and delivery service in Palm Springs, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

· 30% equity stake of 2 separate state licensed manufacturing entities,

· 30% of 1 state licensed cultivation entity and 15% of 1 distribution entity,

· 15% of 3 separate state licensed cultivation and manufacturing entities,

· 50% of 2 Los Angeles dispensaries (NoHo and Hollywood & Vine),

· 100% of Pineapple Express Wellness, Inc., an operating a nationwide Hemp CBD website at PineappleExpressWellness.com,

· 100% of Nordhoff Leases, LLC, an entity entitled to a profit for subleasing 38,000 SF of rental space to commercial cannabis licensed growers at a building In Chatsworth, CA.

· 50% equity interest in 2 Puerto Rico retail store front Dispensaries

We have up to 17% available for sale of this opportunity in increments of $200,000 per .5% or $400,000 per 1%. We offer all investors anti-dilution rights, guaranteed monthly dividends, and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 50-100% in the first year and 150-200% ROI each year thereafter, perpetually. This entity is constantly expanding and picking up assets as we go so the growth potential is enormous.

Interested parties are instructed to reply back for further information.

Warm Regards,

Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

# Re: BizBuySell.com Business Opportunity Inquiry

**Received: Tuesday, September 10, 2019 1:41 PM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**

To: **vpoffice@protonmail.com**

CC: **Vincent Zadeh vincent@pineappleventuresinc.com**

> **PLAINTIFF'S EXHIBIT**
> No. __7__
> Date: 8/7/2020

Thank you for your email. Yes, a lot of our clients keep their equity in LLCs or other entities. I will send you a full breakdown on everything in a follow-up email. I'd also like to set up a time to speak with you when you have a moment so I can walk you through the process.

More coming at you in a follow-up email. What is the amount that you can comfortably invest? I ask so that I can craft a proposal that fits within your comfort zone.

Regards,

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.
*(Apologies for any dictation related typos)*

On Sep 10, 2019, at 11:12 AM, vpoffice@protonmail.com wrote:

Vincent,

Good Afternoon. I believe, I am interested. Is there a contract that I can pre-read before hand. Also, may I buy shares as a company vs. a person?

S. K. Carter

Sent with ProtonMail Secure Email.

------- Original Message -------
On Monday, September 9, 2019 9:06 PM, Vincent Zadeh <vincent@pineappleventuresinc.com> wrote:

Dear Prospective Cannabis Entrepreneurs:

Thank again for your recent inquiry through BizBuySell.com regarding our canna-business opportunities in SoCal.

We are successful cannabis operators with a proven track-record of over 125 successful dispensaries and cannabis production facilities established across 8 states. Part of our process is we sell minority equity to qualified investors in each of our projects (typically up to 25%) to help us build that project and expand to the next one.

Our current focus is our home State of California. The following are a few opportunities that are currently available to accredited investors. All of these opportunities we own and operate ourselves. Some of these opportunities may be of further interest assuming you qualify to invest.

### Deal 1: Own 2.5% - 10% of our Licensed Dispensary at Hollywood and Vine for $100,000 per 2.5% up to 10% for $400,000.

We own a licensed dispensary at Hollywood & Vine in Hollywood. This location is one of the most travelled intersections in the world. We relocated the license from another location within the City and have our approvals to operate. The project is currently in construction plan submittal phase with the City of Los Angeles and our tentative operations start date is November 1st.

Dispensary licenses alone are valued at $3m and based on the amazing location, we feel that the dispensary with leased location is easily worth $4m. We have up to 10% available for sale of this opportunity in increments of $100,000 per 2.5%. We offer all investors anti-dilution rights, guaranteed monthly dividends,  and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 75-100% each year, perpetually.

### Deal 2: Own 2.5% - 10% of our Licensed Dispensary at in North Hollywood for $50,000 per 2.5% up to 10% for $200,000.

We own a licensed dispensary in North Hollywood. This location is not as sought after as the Hollywood and vine location so the valuation is half as a result. We relocated the license from another location within the City and have our approvals to operate. The project is currently in construction plan submittal phase with the City of Los Angeles and our tentative operations start date is November 1st.

Dispensary licenses alone are valued at $3m, but we feel that the dispensary with leased location is worth $2m on a very deep discounted valuation. We have up to 10% available for sale of this opportunity in increments of $50,000 per 2.5%. We offer all investors anti-dilution rights, guaranteed monthly dividends,  and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 50-75% each year, perpetually.

### DEAL 3: Own a Percentage Of Our Entire Pineapple Ventures, Inc. (PVI) Cannabis Conglomerate

Pineapple Ventures has equity in over 18 canna-business licenses in CA and 2 dispensaries in Puerto Rico that are owned and operated by the company, a hemp wellness product site, and cannabis subleases that it draws a rental profit from. Pineapple Ventures is expanding at a substantial rate and will be acquiring more businesses in 2019 and onward. Specifically, PVI owns and operates:

·       100% of a state licensed cultivation, manufacturing, and distribution licensee in Adelanto, CA,

8/6/2020                                   Pineapple Ventures | vpoffice@protonmail.com | ProtonMail

·    30% of a state licensed retail dispensary and delivery service in Los Angeles, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

·    30% of a state licensed retail dispensary and delivery service in Palm Springs, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

·    30% equity stake of 2 separate state licensed manufacturing entities,

·    30% of 1 state licensed cultivation entity and 15% of 1 distribution entity,

·    15% of 3 separate state licensed cultivation and manufacturing entities,

·    50% of 2 Los Angeles dispensaries (NoHo and Hollywood & Vine),

·    100% of Pineapple Express Wellness, Inc., an operating a nationwide Hemp CBD website at PineappleExpressWellness.com,

·    100% of Nordhoff Leases, LLC, an entity entitled to a profit for subleasing 38,000 SF of rental space to commercial cannabis licensed growers at a building In Chatsworth, CA.

·    50% equity interest in 2 Puerto Rico retail store front Dispensaries


We have up to 17% available for sale of this opportunity in increments of $200,000 per .5% or $400,000 per 1%. We offer all investors anti-dilution rights, guaranteed monthly dividends,  and a buy-out clause at investor's sole election anytime after the first year of operations. We fully forecast an ROI for investors of between 50-100% in the first year and 150-200% ROI each year thereafter, perpetually. This entity is constantly expanding and picking up assets as we go so the growth potential is enormous.


Interested parties are instructed to reply back for further information.


Warm Regards,


Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

# Re: Confirmation

Received: ☐ **Thursday, September 19, 2019 7:58 PM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**



PLAINTIFF'S EXHIBIT
No.__8__
Date: 8/7/2020

To: **vpoffice@protonmail.com**

CC: **Vincent Zadeh vincent@pineappleventuresinc.com**

Why? Do you feel like speaking to the many people we've partnered with and successfully made money for? Happy to set up a peace of mind conference call at your convenience.

I've personally spent $5 million of my own dollars and the company spent $15 million on the infrastructure we currently have that is worth at least $30 million. You're investing in something big and in an industry that is huge!

Congrats,

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.
*(Apologies for any dictation related typos)*

On Sep 19, 2019, at 5:49 PM, vpoffice@protonmail.com wrote:

Vincent,

I don't know how I feel about this now...Oh my...Attached is confirmation.

Samantha

Sent with ProtonMail Secure Email.

<Screen Shot 2019-09-19 at 8.46.42 PM.png>

# S. Carter Agreement for 1/2%

**Received: Wednesday, September 11, 2019 11:15 PM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**



PLAINTIFF'S EXHIBIT
No. __9__
Date: 8/7/2020

To: **vpoffice@protonmail.com**

CC: **Jaime Ortega jaime@pineappleventuresinc.com**

Dear Samantha:

Including my partner Jaime on the thread. Attached please find the physical document attached that we would execute.

Please note that our account information is below my signature block. After you sign and after we send you a signed copy of the agreement, you may fund the $100k. After we receive the funds we will go ahead and issue your shares. Once we have your signed agreement back we will get ▓▓▓▓, Inc. formed in ▓▓▓▓▓ for you on a rushed process.

To reiterate you are going to be a minority 1/2% equity holder in the following entities we own and operate:

    100% of a state licensed cultivation, manufacturing, and distribution licensee in Adelanto, CA,

·     30% of a state licensed retail dispensary and delivery service in Los Angeles, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

·     30% of a state licensed retail dispensary and delivery service in Palm Springs, along with full operational management rights to PVI at a fee of 10% of gross revenue on all retail transactions,

·     30% equity stake of 2 separate state licensed manufacturing entities,

·     30% of 1 state licensed cultivation entity and 15% of 1 distribution entity,

·     15% of 3 separate state licensed cultivation and manufacturing entities,

·     50% of 2 Los Angeles dispensaries (NoHo and Hollywood & Vine),

·     100% of Pineapple Express Wellness, Inc., an operating a nationwide Hemp CBD website at PineappleExpressWellness.com,

·     100% of Nordhoff Leases, LLC, an entity entitled to a profit for subleasing 38,000 SF of rental space to commercial cannabis licensed growers at a building In Chatsworth, CA.

·     50% equity interest in 2 Puerto Rico retail store front Dispensaries

Welcome to the family! We are ready to meet anytime. We are centrally located in Century City and available at your convenience.

Regards,

Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

Pineapple Ventures I vpoffice@protonmail.com I ProtonMail

Neu-Ventures, Inc.
10351 Santa Monica Blvd. Suite 420
Los Angeles, CA 90025
Bank of America
Routing Number: 121000358
Account Number: 325117128204



PVI Shareholder Agreement and SPA.pdf
248.04 KB



Account: 325117128204

PLEASE POST THIS PAYMENT FOR OUR MUTUAL CUSTOMER

$80,000.00

Please Direct Any Questions To
(800) 243-2506
Online Bill Payment Processing Center

568/1012

PLAINTIFF'S EXHIBIT
No.  1          0000005001
Date: September 25, 2019

SAMANTHA K CARTER

MEMO: Angel Investment for KV

Pay  EIGHTY THOUSAND AND 00/100 ————————————————— DOLLARS

$ ****80,000.00

TO
THE
ORDER
Of

PINEAPPLE VENTURES, INC
10351 SANTA MONICA BLVD STE 420
LOS ANGELES, CA 90025-6935

01465

Void After 180 DAYS.
Signature On File
This check has been authorized
by your depositor

⑈00500⑈⑈ ⑉:101⑈20568⑈⑈:

PLAINTIFF'S EXHIBIT
No.  10
Date: 8/7/2020

013477910

Seq:  4
Batch:  906583
Date: 09/30/19

Seq:90004 09/30/19
BA':906583 CC:3189800395
WT:01 LTPS:Jacksonville PT
BC:Brentwood District BC CA0-127

Pineapple Ventures Inc

For Deposit only
Bank of America
3251 1712 9235

8/6/2020                                    Pineapple Ventures I vpoffice@protonmail.com I ProtonMail

Carter


Sent with ProtonMail Secure Email.

------- Original Message -------
On Thursday, October 3, 2019 6:13 AM, <vpoffice@protonmail.com> wrote:


Thank you Vincent!

```
PLAINTIFF'S  EXHIBIT
No.   11
Date: 8/7/2020
```

Sent with ProtonMail Secure Email.

------- Original Message -------
On Wednesday, October 2, 2019 11:07 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:



Hi Samantha:

Welcome to our equity shareholder database for Pineapple Ventures, Inc. Attached please find your shares. Please keep this digital record as your proof of ownership, along with your contract, and proof of payment.

Also, please expect 1-2 updates per month going forward along with information concerning our performance.

We are happy to have you along for the ride!

I will separately email you sometime next week with the documentation supporting the loan to your corporate entity for your records.

Cheers,

Vincent Zadeh
Co-Founder


Pineapple Ventures, Inc.

📎 **PVI Credits and Debits.pdf**
   96.95 KB



PLAINTIFF'S EXHIBIT
No. 12
Date: 8/7/2020

TRANSFER OF
THESE SHARES IS
RESTRICTED
UNLESS
APPROVED BY
THE BOD

00119

*This Certifies That*

Kizvish, Inc.

*is the owner of*

400

*fully paid and non-assessable shares of the common stock of*

## Pineapple Ventures, Inc.

# COMMON STOCK

WITHOUT PAR VALUE

*incorporated under the laws of*
STATE OF CALIFORNIA

*Transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney, upon proper endorsement and surrender of this certificate.*
IN WITNESS WHEREOF *this Corporation has caused this certificate to be executed by the signatures of its duly authorized officers and the seal of this Corporation.*

*Dated this* ____1____ *day of* _____ October _____ 2019.

SECRETARY

PRESIDENT

PLAINTIFF'S EXHIBIT
No. 13
Date: 8/7/2020

I/we..........................................................

for value received ............................ paid to me/us by

..........................................................
(transferee)

..........................................................
(address)

hereby sell, assign and transfer to the transferee

400

FULLY PAID AND NON-ASSESSABLE SHARES

WITHOUT PAR VALUE

of the Common Stock of

**Pineapple Ventures, Inc.**

represented by the within Certificate, to hold unto the transferee, his or her executors, administrators, and assigns, subject to the several conditions on which I/we held the same at the time of the execution of this assignment; and the transferee, by acceptance of this assignment, agrees to take those shares subject to those conditions.

Signed the ............................ day of ............................ 20 .

..........................................................
(Signature(s) of transferor(s))

Witness to the signature(s) of the transferor(s):

..........................................................
(Signature of witness)

..........................................................
(Address)

* The shares of stock represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"), or any state securities laws and may not be offered, sold, transferred, pledged, assigned or hypothecated in the absence of an effective registration of these shares under the Act and applicable state securities laws unless in the opinion of the corporation's counsel such registration is not required.

** The shares of stock represented by this certificate are subject to restrictions upon transfer and may not be sold, transferred, pledged, assigned, hypothecated or otherwise disposed of except in accordance with and subject to all of the terms and conditions of a certain stock option agreement, if such an agreement has been executed, between this corporation and the registered holder of this certificate. The corporation shall furnish a copy of such agreement to the registered holder of this certificate upon written request and without charge.

On Oct 3, 2019, at 8:45 AM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:
Done!

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

> PLAINTIFF'S EXHIBIT
> No.___14___
> Date: 8/7/2020

*(Apologies for any dictation related typos)*

On Oct 3, 2019, at 4:15 AM, vpoffice@protonmail.com wrote:

Good morning,
I created a new email address██████@████████████. Could you update, anytime, no rush:)..

Carter

Sent with ProtonMail Secure Email.

------- Original Message -------
On Thursday, October 3, 2019 6:13 AM, <vpoffice@protonmail.com> wrote:

Thank you Vincent!

Sent with ProtonMail Secure Email.

------- Original Message -------
On Wednesday, October 2, 2019 11:07 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:

Hi Samantha:

Welcome to our equity shareholder database for Pineapple Ventures, Inc. Attached please find your shares. Please keep this digital record as your proof of ownership, along with your contract, and proof of payment.

Also, please expect 1-2 updates per month going forward along with information concerning our performance.

We are happy to have you along for the ride!

I will separately email you sometime next week with the documentation supporting the loan to your corporate entity for your records.

Cheers,

# Re: Follow up

Received: **Thursday, September 26, 2019 9:30 PM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**

> **PLAINTIFF'S EXHIBIT**
> No. __15__
> Date: 8/7/2020

To: **vpoffice@protonmail.com**

But here's some good news, We are absolutely crushing it. PineappleExpress.com is blowing up!

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

*(Apologies for any dictation related typos)*

On Sep 26, 2019, at 7:25 PM, vpoffice@protonmail.com wrote:

ok

Sent with ProtonMail Secure Email.

------- Original Message -------
On Thursday, September 26, 2019 7:16 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:

Nothing today Samantha. We will check again tomorrow. Thank you!

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

*(Apologies for any dictation related typos)*

On Sep 26, 2019, at 11:24 AM, vpoffice@protonmail.com wrote:
Ok

Sent with ProtonMail Secure Email.

------- Original Message -------
On Thursday, September 26, 2019 12:14 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:

Pineapple Ventures I vpoffice@protonmail.com I ProtonMail

**Vincent Zadeh**
**Co-Founder**

Pineapple Ventures, Inc.

------- Original Message -------
On Wednesday, September 25, 2019 2:19 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:

Hi Samantha:

Do you have an updated phone number? Having trouble reaching you. Not sure what the issue is with your bank. It would be a shame that you wouldn't be able to participate in the investment due to bank error. We are doing big things and would like you along for the ride.

Please do your best to ensure our account is credited for the funds agreed upon by Friday otherwise I can't guarantee your contract will remain active. I'm sure you can understand why that is. Hopefully you can make things happen on your end.

Cheers,

PLAINTIFF'S EXHIBIT
No. 16
Date: 8/7/2020

Vincent Zadeh
Co-Founder

Pineapple Ventures, Inc.


On Wed, Sep 25, 2019 at 10:52 AM <vpoffice@protonmail.com> wrote:
Hi Vincent,

I cannot cancel the mailed payment because they claim not to see it. Although it is is plain site.


Sent with ProtonMail Secure Email.

------- Original Message -------
On Wednesday, September 25, 2019 1:43 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:


Hi Samantha:

Sorry they're doing that to you. At this point in order to participate in this investment I would definitely suggest wiring it. I assure you it will not be processed twice. You can just cancel the mailed payment.

Wiring instructions are below:

Pineapple Ventures, Inc.
10351 Santa Monica Blvd. Suite 420
Los Angeles, CA 90025

Ok, perfect. This is what I need to keep your contract active. This means that the check was sent but not cashed yet. We will check the mail today and again on Friday and let you know what happens. In the event it is delayed you can stop payment on Monday and just wire it.

Thanks,

Vincent Zadeh
Co-Founder

Pineapple Ventures, Inc.


On Thu, Sep 26, 2019 at 8:59 AM <vpoffice@protonmail.com> wrote:
See Attachment. I do not see how a payment can be outstanding...


Sent with ProtonMail Secure Email.

------- Original Message -------
On Thursday, September 26, 2019 11:33 AM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:



Good morning:

My colleagues have asked me for Information on whether or not your bank mailed out a check after all. I'm not sure what to tell them. Do you know what's going on with that? Typically if you send an online bill payment with a bank such as Fidelity they will send the check out and then debit your account once it is cashed buy the recipient. Can you confirm that a check was sent please?



--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

*(Apologies for any dictation related typos)*

On Sep 25, 2019, at 12:31 PM, vpoffice@protonmail.com wrote:
ok.


Sent with ProtonMail Secure Email.

Pineapple Ventures | vpoffice@protonmail.com | ProtonMail

Bank of America
Routing Number: 121000358
Account Number: 325117128233

--
Vincent Zadeh
Co-Founder
Pineapple Ventures, Inc.

> PLAINTIFF'S  EXHIBIT
> No.  17
> Date: 8/7/2020

*(Apologies for any dictation related typos)*

On Sep 25, 2019, at 10:38 AM, vpoffice@protonmail.com wrote:
Vincent,

From my end I do not see that Fidelity processed anything, I see the payment still in cue. I inquired with them and was informed that they do not see any payments going out. I asked how is that possible? I am looking at it. It's as though they are trying to retain my money in my account. IF I wire it, there is a possibility that you could get it twice. There is no assistance from them...

Samantha

Sent with ProtonMail Secure Email.

# Re: Fwd: Welcome to the Pineapple Ventures Family

**Received: Wednesday, October 9, 2019 11:05 AM**

From: **Pineapple Ventures Inc. info@pineappleventuresinc.com**

To: ▮▮▮▮▮▮▮▮▮▮▮**com, vpoffice@protonmail.com**

```
PLAINTIFF'S EXHIBIT
No.   18
Date: 8/7/2020
```

CC: **Jaime Ortega jaime@pineappleventuresinc.com, Shawn Credle shawn@pineappleventuresinc.com**

Hi Samantha:

Good Morning! The good news is your shares were issued last week and the funds are finally confirmed by our bank as paid by your bank today. Their version of the story is that your bank (Fidelity) told our bank (Bank of America) that the check wouldn't be paid and would be returned. Thereafter, Bank of America informed us of this and we in-turn informed you to ask Fidelity what the issue was with the check being paid. Bank of America now (today) claims that upon a second attempt the check was paid. I personally think this is not accurate and Bank of America caused this rift between us due to their ineptness as a Bank and their outdated electronic payment processing systems. Attached is a printout of our activity in this Bank of America Account. You will notice they charged us a $35 fee for the check allegedly returning which I have already gotten them to credit to our account again. This is one of 3 different accounts we have at various banks for Pineapple Ventures, Inc. We also have a savings account with over $500k at BofA that you will see noted as we were forced to transfer funds in to cover Bank of America debiting and crediting the account on 6 different occasions related to this simple check deposit. Suffice it to say that regardless of being able to repair our relationship with you we are parting ways with BofA.

As an apology to you for Bank of America's screw up, we are going to issue you another 100 shares, bringing your total to 500. We feel this is a generous way to make things right and reward for for the added stress our bank caused both of us. Please confirm and we will make that happen for you.

Cheers,


Vincent Zadeh
Co-Founder

Pineapple Ventures, Inc.


On Thu, Oct 3, 2019 at 4:15 AM <vpoffice@protonmail.com> wrote:

> Good morning,
> I created a new email address kizvish@protonmail.com. Could you update, anytime, no rush:)..

# Re: Shareholder update and Dividend Payments

**Received: Sunday, November 3, 2019 6:46 PM**

**From: Pineapple Ventures Inc. info@pineappleventuresinc.com**

```
PLAINTIFF'S EXHIBIT
No.   19
Date: 8/7/2020
```

To: ███████@███████.com

You will see just how fake we are when we file our lawsuit against you for defamatory statements and harassment.

Vincent Zadeh
Co-Founder

Pineapple Ventures, Inc.

On Sun, Nov 3, 2019 at 4:38 PM <k██████@██████.com> wrote:

---

**KIZVISH, INC.**

307-772-4767
kizvish@protonmail.com

Kizvish, Inc.
1712 Pioneer Ave
Suite 1353
Cheyenne, WY 82001

October 5, 2019

Jamie Ortega
Pineapple Ventures, Inc.
Neo-Ventures, Inc.
1091 Santa Monica Blvd #420
Los Angeles, CA 90025

RE: Notice to file Federal Suit

Dear Jamie Ortega,

Effective October 7, 2019, Kizvish, Inc. announce all ties to Pineapple Ventures, Inc and Neo-Ventures, Inc. Your company is not responsible, fiscally, to lose track of my personal funds for the investment for Kizvish, Inc. of $80,000.00 to your companies. Since I invested personally, I will file a federal lawsuit personally, if needed, to secure my $80,000.00 back. Since, I am a personal resident of the District of Columbia, that would be my personal jurisdiction. The contract/purchase agreement/all agreements are canceled/voided per
-all of the demanding email that I receive to give your companies more money beyond the agreed amount
-for your company losing the initial investment
-for no shares ever being issued, to begin with
It also appears that you have other complaints with BuyBizSale.com from other investors as well.
In addition, your company had only $1600 in your company account and depended upon my 80k to live off of. Your company appears to be a scam/scheme. At this time your company is not well-suited to do business with and your email behaviors are harassing and unprofessional as I personally have been patient with Vincent Zadeh. Please retain this as a notice to file suit, immediately, if by Friday October 10, 2019 I do not receive my $80,000.00 investment back that your company claims to have no trace of. Please return my personal investment of $80,000.00 to Samantha Carter, 1001 S Main St, Ste 49 Kalispell, MT 59901

Regards,

s/Samantha Carter

---

**Dear Fake Company,**

This notice was sent to you on October 8, 2019. AS far as Kizvish or Samantha Carter is concerned for legal purpose; This letter was and still is valid. I can see there was a typo in the phone number but you are pretending that you have no contact information for either when it was typed into the purchase agreement, that you no longer have because you are a scam. Vincent Zadeh, you have committed a felony.

Your lack of actions have serious consequences for the entire company. You have had ample time to return the money your company scammed from Samantha Carter, who has no contract with you. The funds were not from Kizvish, Inc. The funds came from a person.

I cannot believe anything that you say, print or email. Please respond to the complaints as you receive them.

Samantha Carter

> PLAINTIFF'S EXHIBIT
> No. __20__
> Date: 8/7/2020

Sent with ProtonMail Secure Email.

------- Original Message -------
On Sunday, November 3, 2019 2:07 PM, Pineapple Ventures Inc. <info@pineappleventuresinc.com> wrote:


Hi Samantha:

We have not heard back from you in regards to execution of an agreement to cancel your transaction. As a result, you remain a shareholder of Pineapple Ventures, Inc. Since you are a shareholder, we will need a good mailing address for you along with phone number so we can contact you with updates and also mail statements and checks based on the company's performance. If we do not receive that information, we will refrain from further communication until we do.

Regards,

Vincent Zadeh
Co-Founder


Pineapple Ventures, Inc.


📄 Pasted-image-Sun Nov 03 2019 182909 GMT-0600 (CST).png
   66.23 KB

PLAINTIFF'S EXHIBIT
No.  21
Date: 8/7/2020

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (the "Agreement") is made on September 19, 2019, among NEU-VENTURES, INC., a California Corporation (the "Shareholder"), whose address is 10351 Santa Monica Boulevard, Suite 420, Los Angeles, California 90025; PINEAPPLE VENTURES, INC., a California corporation (the "Company") whose mailing address is 10351 Santa Monica Boulevard, Suite 420, Los Angeles, California 90025; and Kizvish, Inc., a Wyoming Corporation (the "Buyer"). The Shareholder, the Company and the Buyer shall be referred to, collectively, as the "Parties" and, individually, as a "Party."

The Company is in the business of managing cannabis operators duly licensed under the State and local laws (the "Business"). The Shareholder is the owner of all of the issued and outstanding capital stock (the "Shares") of the Company, as set forth on Exhibit A attached hereto. The Shareholder desires to sell to Buyer and Buyer desire to purchase from the Shareholder five hundred (500) of the outstanding Shares (the "Sale Shares") for the Purchase Price (defined in Section 1.2 below), upon the terms and subject to the conditions hereinafter set forth, which constitutes 4/10 of 1% (.40%) of the issued and outstanding common stock of the Company (400 shares).

In consideration of the promises and of the respective covenants and agreements contained herein, the parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF SHARES; CLOSING

1.1    **Purchase and Sale.**  On the terms and subject to the conditions set forth in this Agreement, the Shareholder hereby sells, assigns, transfers, conveys and delivers to Buyer, and Buyer hereby purchases from Shareholder, the Sale Shares.

1.2 **Purchase Price; Closing and Deliverables.**  The purchase price for the Sale Shares shall be Eighty Thousand and 00/100 Dollars ($80,000) (the "Purchase Price"). To deliver the Purchase Price, Buyer agrees to:

(a) deliver to the Shareholder Eighty Thousand and 00/100 Dollars ($80,000) (the "Purchase Price").

     a.     **Payment.** Buyer shall deliver the funds.

     b.     **Shareholder Agreement.** Each Party shall deliver at the Closing a duly executed copy of the Shareholder Agreement attached hereto as Exhibit A.

     c.     **Sale Shares.**  Shareholder will provide duly executed Stock Powers for the Sale Shares, and the Company will provide either a stock certificate for the Sale Shares or, if the Company's shares are not certificated, other evidence of the transfer of Sale Shares from the Shareholder to the Buyer.

Failure of the Company or Shareholder to deliver or perform on any item required under paragraphs (b), or (c) above, will delay the Closing and, if the failure continues for more than 14 days, will render this Agreement null and void.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER

The Shareholder, for itself and on behalf of the Company, represent and warrant to the Buyer that the representations and warranties contained in Sections 2.1 through 2.9, below, are true and correct on the date hereof in all material respects.

2.1     **Authority.** The Shareholder has full power and authority to execute and deliver this Agreement and to perform her obligations hereunder.  This Agreement has been duly executed by the Shareholder and constitutes a valid and binding obligation of the Shareholder enforceable in accordance with its terms. Neither Shareholder nor the Company need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in connection with the transactions contemplated by this Agreement.

2.2     **No Conflict or Violation.**  Neither the execution and delivery of this Agreement or the Shareholder Agreement attached hereto, nor the consummation of the transactions contemplated hereby and thereby, will (a) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, or charge of any government, governmental agency, or court to which the Shareholder is subject or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license, instrument, or other arrangement to which the Shareholder is a party or by which it is bound or to which any its assets are subject.   Neither the execution nor delivery of the Shareholder Agreement attached will (a) violate any statute, regulation, rule, judgment, order, decree, ruling, or charge of any government, governmental agency, or court to which the Company is subject or (b) conflict with, result in a breach of, constitute a default under, the Company's Articles of Incorporation or Bylaws, as they may be amended, or any other governing document, material agreement, contract, lease, license, instrument, or other arrangement to which the Company is a party or by which it is bound or to which any its assets are subject.

2.3     **Title.**  The Shareholder has good and valid title to the Shares free and clear of any and all liens, restrictions (other than restrictions under applicable federal and state securities laws), pledges, charges, claims and encumbrances of any kind (collectively, "Liens").  Upon delivery of the Sale Shares to Buyer and payment of the Purchase Price as contemplated hereby, Buyer shall acquire good and valid title to all of the Sale Shares, free and clear of all Liens, other than those arising from acts of Buyer.  The Shareholder is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Shareholder to sell, transfer, or otherwise dispose of any the Shares, or grant to any third party any rights in the Shares, other than this Agreement.  The Shareholder is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Company.

2.4   **Capitalization.**   The authorized capital stock of the Company consists of one hundred thousand (100,000)  Shares of  voting common stock, with no par value, all of which are presently issued and outstanding and no Shares are reserved for issuance.  All of the issued and outstanding Shares of the Company have been duly authorized, are validly issued, fully paid and non-assessable and are held of record and beneficially by the shareholders identified on Exhibit A hereto.  There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its capital stock.  There are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Company.  Besides the common stock referred to above, there are no other authorize or issued classes of stock of the Company

2.5   **Certain Liabilities.**   Shareholder, has not created any liabilities or indebtedness on behalf of the Company other than those that have been disclosed in writing to Buyer.

2.6   **Taxes.** All income tax returns (or available extensions thereof) required to be filed by the Company have been timely filed and all taxes, as required to be paid in connection with those returns, have been paid.

2.7   **Permits and Licenses**.   The Company and Shareholder have all licenses and permits required or necessary under State and local law to engage in the Business.

2.8   **Compliance with Laws**.   The Company is in compliance with all applicable laws and regulations governing the Company or the Business, except where any noncompliance has not and will not result in a material adverse affect on the Company's financial condition or operations.

2.9   **Additional Representations.**

(a)   The Company's corporate existence is in good standing; and

(b)   All proceedings required by law or provisions of this Agreement to be taken by the Shareholder and the Company in connection with the transactions provided for in this Agreement have been duly and validly taken.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer represents and warrants to the Shareholder that the following representations and warranties are true and correct on the date hereof in all material respects.

3.1   **Purchase for Investment.** Buyer will acquire the Sale Shares for its own account for investment and not with a view toward any resale or distribution thereof.

## ARTICLE IV
## COVENANTS

4.1    **Access and Information.**

   **Release of information.** The Shareholder and the Company shall provide to Buyer and to Buyer's agents full access, during normal business hours, throughout the period before the closing, to all of the Company's properties, books, contracts, commitments, and records and shall furnish to Buyer during that period all the information concerning the Company's affairs that the Buyer may reasonably request.

   4.2    **Conduct of business pending Closing.**  Shareholder also covenants that from the effective date of this Agreement to the date of the Closing: (a) the Business will be conducted only in the ordinary course of business; and (b) no contract or commitment will be entered into by or on behalf of the Company extending beyond the Closing, except normal commitments made in the ordinary course of business.

## ARTICLE V
## CONDITIONS PRECEDENT

   This Agreement and all of the obligations of the Buyer under this Agreement are, at the Buyer's option, subject to the fulfillment, before or at the times set forth herein, of each of the conditions set forth below. If the Buyer is not satisfied with any of the conditions contained herein, the Buyer shall give the Shareholder written notice of such dissatisfaction at, or before the Closing, and be entitled to terminate this Agreement.

   5.1    **Representations and Warranties True at Closing.** The representations, covenants, and warranties of the Shareholder contained in this Agreement shall be true at the time of the Closing.

   5.2    **Performance.** The obligations, agreements, documents, and conditions required to be signed and performed by the Shareholder shall have been performed and complied with before or at the Closing.

## ARTICLE VI
## DEFAULT

   6.1    **Default by the Buyer.** If the Buyer defaults and the default is not cured within a reasonable period, the Shareholder may pursue all available legal and equitable remedies.

   6.2    **Default by the Shareholder.** If the Shareholder default and the default is not cured within a reasonable period, the Buyer may pursue all available legal and equitable remedies.

## ARTICLE VII
## INDEMNIFICATION

7.1 **Indemnification By Shareholder.** The Shareholder shall indemnify, defend and hold harmless Buyer from and against any and all losses, liabilities, claims, damages, actions, judgments, costs and expenses, including reasonable attorney's fees (collectively, "Losses"), arising out of, based upon or relating to (a) any breach of any representation or warranty or nonfulfillment of any covenant of Shareholder set forth in this Agreement or any other document that is being executed and delivered to Buyer in connection with transactions identified in Section 5.3 above, (b) the Company's or Shareholder's violation of any applicable laws or regulations, including, specifically but without limitation, any BCC administrative violations that may arise from Company or Shareholder's non-disclosure of Buyer to the BCC in accordance with Section 1.2(d); or (b) enforcement of this Section 7.1.

7.2 **Indemnification by Buyer.** Buyer shall indemnify, defend and hold harmless the Shareholder from and against any and all Losses arising out of, based upon or relating to (a) any breach of any representation or warranty or nonfulfillment of any agreement of Buyer set forth in this Agreement; or (b) enforcement of this Section 7.2.

7.3 **Third Party Claims.**

(a) If any third party shall notify any party to this Agreement (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against any other party to this Agreement (the "Indemnifying Party) under this Article VII, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party thereby is prejudiced.

(b) Any Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of his choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages by the Indemnifying Party and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c) Unless and until an Indemnifying Party assumes the defense of the Third Party Claim as provided in Section 7.3(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner he or it reasonably may deem appropriate. In no event shall the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be unreasonably withheld).

7.4 **Survival of Representations and Warranties.** The representations and warranties of each party contained in this Agreement shall survive the Closing Date.

## ARTICLE VIII
## OTHER PROVISIONS

8.1    **Amendment.**  This Agreement and the Schedules hereto may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

8.2    **Entire Agreement; Third Party Beneficiaries.**  This Agreement, together with the Schedules hereto, constitutes the entire Agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

8.3    **Further Assurances.**  The parties agree (i) to furnish upon request to each other such further information, (ii) to execute and deliver to each other such other documents, and (iii) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

8.4    **Governing Law.**  This Agreement shall be governed by, construed, interpreted and the rights of the parties determined in accordance with the laws of the State of California (regardless of the laws that might be applicable under principles of conflicts of law).

8.5    **Notices.**  Any notice or consent required to be given pursuant to this Agreement or otherwise desired to be delivered by one party to the other, shall be effective only if in writing which is either (a) personally delivered to such party at its address set forth below (or to such other place as the party to receive such notice shall have specified by notice in advance thereof); (b) by Federal Express or other similar next business day air courier, or (c) sent by electronic mail (i.e., e-mail) at the e-mail address below.  Notice shall be deemed given upon personal delivery or sending an e-mail, or one (1) business day following deposit with an air courier. Notices shall be deemed properly addressed if given at the following:

|       |                     |                                             |
|-------|---------------------|---------------------------------------------|
| (i)   | If to Shareholder:  | Neu-Ventures, Inc.                          |
|       |                     | 10351 Santa Monica Blvd., #420              |
|       |                     | Los Angeles, California 90025               |
|       |                     | Attn: Jaime Ortega                          |
|       |                     | E-mail: info@PineappleVenturesinc.com       |
|       | with a copy to:     | _____         |
| (ii)  | If to Company:      | Pineapple Ventures, Inc.                    |
|       |                     | 10351 Santa Monica Blvd., #420              |
|       |                     | Los Angeles, California 90025               |
|       |                     | Attn: Jaime Ortega                          |
|       |                     | E-mail: Jaime@pineappleventuresinc.com      |
|       | If to Buyer:        | Kizvish, Inc.                               |
|       |                     | vpoffice@protonmail.com                     |

*Page 6*
*Stock Purchase Agreement*

8.6   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original agreement for all purposes.  Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for any purposes whatsoever.

8.7   **Drafting Party.**  No rule of law that requires that any part of the Agreement be construed against the party drafting the language will be used in interpreting this Agreement.

8.8   **Expenses.**  Each party shall each pay its own costs and expenses, including legal, accounting, consulting and other professional fees, incurred by it in connection with the negotiation, preparation and performance of this Agreement and the transactions contemplated hereunder; provided, however, that the Company shall pay all costs and expenses of the Shareholder, including legal fees, incurred at the request and for the benefit of the Shareholder in connection with the negotiation, preparation and performance of this Agreement and the transactions contemplated hereunder.

8.9   **Successors and Assigns.**  This Agreement, and all rights and powers granted hereby, will bind and insure to the benefit of the parties hereto and their respective successors and assigns.

8.10   **Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**SHAREHOLDER:**

NEU-VENTURES, INC., a California
corporation

By: _____ Jaime Ortega
Its: _____ Director

**COMPANY:**

PINEAPPLE VENTURES, INC., a California
corporation

By: _____ Jaime Ortega
Its: _____ Director

**BUYER:**

Kizvish, Inc.

By: _____

## EXHIBIT A

### (SHARES)

| Shareholder | No. of Shares | Cert. No. |
|---|---|---|
| Neu-Ventures, Inc. | 100,000 | 1 |

*Exhibit A to Stock Purchase Agreement*
*(Shares)*

## EXHIBIT B

### (SHAREHOLDER AGREEMENT)

### SHAREHOLDER AGREEMENT FOR
### PINEAPPLE VENTURES, INC.

This Shareholder Agreement (this "Agreement") is made and entered into as of the September 19, 2019, by and between Kizvish, Inc. ("PURCHASER"), Neu-Ventures, Inc., a California corporation ("Neu-Ventures"), whose address is 10351 Santa Monica Blvd #420, Los Angeles, California 90025, and Pineapple Ventures, Inc., a California corporation whose address is 10351 Santa Monica #420, Los Angeles, California 90025 (the "Corporation").

### RECITALS

A.      Neu-Ventures is a Majority owner of the Common Stock of the Corporation;

B.      Neu-Ventures and PURCHASER desire to enter into this Agreement describing their respective rights and obligations as shareholders of the Corporation, have agreed to enter into this Agreement.

### AGREEMENT

The parties agree:

1.      **Acquisition of the PURCHASER Shares.** Upon payment for the PURCHASER Shares in accordance with the Stock Purchase Agreement of even date herewith and incorporated herein by this reference, the PURCHASER Shares will be duly-issued, fully-paid and non-assessable shares of the Corporation's common stock, and will further be governed by and subject to the provisions of this Agreement.

2.      **Anti-Dilution.** The Corporation shall not issue any additional shares, whether voting or nonvoting, to others that will cause PURCHASER to have less equity, at any time.

3.      **Dividends; Monthly Distributions of Net Cash From Operations**. The Corporation shall make monthly dividend distributions of 4/10 of 1% (.40%) of the Net Cash From Operations to PURCHASER. "Net Cash From Operations" means the gross cash proceeds derived from Corporation operations during the preceding calendar month (including sales and dispositions in the ordinary course of business) less the portion thereof used to pay all Corporation operating expenses, (as projected in exhibit A) taxes, debt payments, capital improvements, replacements, and reasonable reserves and contingencies for that month, all as reasonably determined by the Board.  "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowance, but shall be increased by any reductions of reserves previously established.

*Exhibit B to Stock Purchase Agreement*
*(Shareholder Agreement)*

4.   **Put Rights.** At any time after twelve months of the execution of this Agreement, PURCHASER shall have the right to compel the Corporation to purchase, or cause to be purchased, all (but not less than all) of the PURCHASER Shares within thirty (30) days of written notice to the Corporation that PURCHASER intends to exercise this put right (a "Put Notice"). In the event that PURCHASER exercises this put right, the purchase price shall be equal to one hundred ten percent (110%) of the full value paid by PURCHASER to purchase the PURCHASER Shares. The Corporation shall pay the purchase price for the PURCHASER Shares in cash or other immediately available funds at closing, which shall take place thirty (30) days (or the soonest business day thereafter) following delivery of the Put Notice, at a place and time specified by PURCHASER, unless otherwise agreed by the parties.

5.   **Right to Indemnification.** In the event that PURCHASER is a party to or is threatened to be made a party to or is involved in any investigation, action, suit, or proceeding, whether civil, criminal, administrative, or investigative, formal or informal, by reason of the fact that he is or was a shareholder, director or officer of the Corporation, whether the basis of the proceeding is alleged action in his capacity as a shareholder, director, officer, employee, or agent or in any other capacity, PURCHASER shall be indemnified, defended, and held harmless by the Corporation against all expenses, liability, and loss (including attorney fees, judgments, fines, excise taxes, or penalties and amounts to be paid in settlement) actually incurred by him in connection therewith. Amounts to which PURCHASER is entitled under this Section shall be paid within thirty (30) days of PURCHASER's demand therefore and presentation of appropriate documentation of the expense.

6.   **Super-Majority Requirements.** In no event may action be taken by the Shareholders or the Board of Directors of the Corporation regarding a Fundamental Issue without the approval, by vote or written consent, of Shareholders holding not less than eighty percent (80%) of the issued and outstanding voting shares. "Fundamental Issue" means any of the following matters: (i) amendment of the Articles of Incorporation or Bylaws of the Corporation; (ii) issuance of additional shares or other increase of the Shareholders' equity in the Corporation; (iii) merger or consolidation of the Corporation with another entity; (iv) transactions by the Corporation with any Shareholder or any related party other than in the ordinary course of business; (v) redemption of stock; (vi) dissolution; (vii) transactions where the Corporation would borrow or expend funds of more than Five Hundred Thousand and 00/100 Dollars ($500,000.00); and (viii) sale of all or substantially all of the Corporation's assets outside of the ordinary course of business.

7.   **Related Agreements.** This Agreement is being executed as part of a transaction between PURCHASER and the Corporation which includes the following related agreements: the Stock Purchase Agreement and any other written agreements executed in connection therewith (the "Related Agreements").

8.   **Legend on Certificates.** The Shareholders agree the following or similar legend will be placed on all share certificates issued to them: The shares of stock represented by this certificate have not been registered under the Securities Act of 1933 or under the securities law of any state. The shares are restricted as that term is used in Rule 144 of the Securities and Exchange Commission. Transfers of the shares cannot be made unless in compliance with

*Exhibit B to Stock Purchase Agreement*
*(Shareholder Agreement)*

applicable state and federal law and until many conditions have been fulfilled, including holding the shares for two years after they have been fully paid. Please consult Rule 144 for complete information. The shares represented by this certificate are subject to a shareholder agreement, between some or all of the promoters and/or shareholders of this corporation, which agreement places restrictions on these shares. The Agreement is on file with the secretary of the Corporation and may be examined. The restrictions are not invalidated by a failure to place the legends on the shares.

9.      **Termination.** This Agreement will terminate on the occurrence of any of the following events:

a.      The occurrence of any event that reduces the number of Shareholders of the Corporation who are parties to this Agreement to one.

b.      The voluntary agreement of all parties to this Agreement.

10.     **Ratification of Agreement.** The Shareholders will vote their stock in the Corporation as provided in this Agreement so as to cause the Corporation to adopt and ratify all the terms of this Agreement.

11.     **Notices.** All notices, offers, acceptances, requests, and other communications dealing with this Agreement will be in writing and will be deemed to have been given if delivered or mailed by certified or registered mail to the Shareholders at the addresses of record with the Corporation.

12.     **Additional Shareholders.** Additional persons may become Shareholders under procedures established by the present Shareholders.

13.     **Mergers, Substitute and Resulting Securities.** This Agreement will apply to securities received in exchanges, whether by merger or otherwise, and to securities resulting from ownership or securities contemplated by this Agreement or traceable to it.

14.     **Miscellaneous.** The terms of this Agreement will be binding on, enforceable by, and inure to the benefit of the heirs and successors of the parties. This Agreement will be governed by and construed in accordance with the laws of the State of California. Because of the difficulty of assessing damages and the acknowledgment of the parties that each is relying on the others to perform under this Agreement, and that there would not be an adequate remedy at law for a breach of this Agreement, any breach may be enjoined by injunctive relief. A breach by one party does not justify rescission by the others unless all others agree. A failure to insist on performance does not waive the right to insist on performance in the future, or even as to part breaches, unless the breaching party has been prejudiced by an unreasonable delay in asserting the right. One executed copy of this Agreement will be on file with the Corporation's secretary.

15.     **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement shall

*Exhibit B to Stock Purchase Agreement*
*(Shareholder Agreement)*

become effective when one or more counterparts have been executed by each of the parties and delivered to the other parties. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

16. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflicts-of-law principles that would require the application of any other law.

17. **Entire Agreement.** This Agreement (including all Exhibits and other attachments hereto), contains the entire agreement of the parties with respect to the matters set forth in this Agreement, and no representations made by either party may be relied on unless set forth in this Agreement, or in the exhibits and schedules to this Agreement. This Agreement supersedes all prior agreements, understandings, promises, and arrangements, oral or written, between the parties with respect to the matters set forth herein, may be altered or amended only by an instrument in writing, duly executed by all of the parties.

18. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Any purported assignment of rights or delegation of obligations in violation of this Section, whether voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or otherwise, is void.

19. **Third Parties.** Nothing in this Agreement, express or implied, is intended to or shall be construed to confer upon or give any person other than the parties and their respective successors and permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement.

20. **Waiver.** Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

21. **Severability.** In the event that a court or arbitral body of competent jurisdiction holds any provision of this Agreement invalid, illegal or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions of this Agreement, which other provisions shall remain in full force and effect, and the application of such invalid, illegal or unenforceable provision to persons or circumstances other than those as to which it is held invalid, illegal or unenforceable shall be valid and be enforced to the fullest extent permitted by law. To the extent permitted by applicable law, each party waives any provision of law that renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

*[Signatures on following page]*

*Exhibit B to Stock Purchase Agreement*
*(Shareholder Agreement)*

The parties have executed this Shareholder Agreement as of the day and year first above written.

**SHAREHOLDERS:**

PURCHASER
KIZVISH, INC., a Wyoming Corporation

_____
By:

**Neu-Ventures:**

NEU-VENTURES, INC., a California
Corporation

_____
By: _____ Jaime Ortega
Its: _____ Director

**Corporation:**

PINEAPPLE VENTURES, INC., a
California Corporation

_____
By: _____ Jaime Ortega
Its: _____ Director

*Exhibit B to Stock Purchase Agreement*
*(Shareholder Agreement)*

